## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| HANNAH DEMPSEY, and KATHLEEN HOOD, on behalf of themselves and a class of all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>GERBER PRODUCTS COMPANY,<br><br>         Defendant. | Civil Action No.<br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Hannah Dempsey and Kathleen Hood (collectively, "Plaintiffs") individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Gerber Products Company ("Gerber" or "Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## INTRODUCTION

1. On February 4, 2021, the United States House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Subcommittee") published a report revealing that baby foods manufactured by some of the largest baby food manufacturers in the United States, including Defendant, are "tainted with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury" (the "Heavy Metals").[1]

---

[1] Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "Subcommittee Report") (February 4, 2021) at 2 (available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf) (last accessed May 20, 2021).

2.      The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared these Heavy Metals dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.[2] Even low levels of exposure can cause serious and often irreversible damage to brain development.[3]

3.      Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell products that are unsafe for babies to consume.

4.      Defendant does not disclose the Heavy Metal content of its Baby Food Products[4] on its labels or in its marketing materials.

5.      Defendant also failed to warn consumers that the Baby Food Products may contain potentially dangerous levels of Heavy Metals.

6.      Defendant markets, advertises, represents, and warrants that the Baby Food Products it manufactures, distributes, and sells, are safe and suitable for consumption by babies.

7.      As alleged herein, Defendant's marketing and advertising of its products is false, deceptive, and misleading to reasonable consumers because Defendant knows that Heavy Metals are harmful to babies and yet it sells the Baby Food Products nonetheless.  Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding the Baby Food Products, namely, that they were unsafe and unsuitable for babies; that they contained Heavy Metals; the levels of the Heavy Metals; that internal testing showed that its products contained harmful Heavy Metals; and that its internal policies permitted the sale of baby foods with harmful Heavy Metals.

---

[2] *Id.*

[3] *Id.*

[4] The term "Baby Food Products" refers to all products manufactured by Defendant that have been determined to contain Heavy Metals, whether through Defendant's own documents submitted to the Subcommittee or through independent testing.

8.      No reasonable consumer seeing Defendant's marketing and packaging would expect the Defendant's Baby Food Products to contain dangerous levels of Heavy Metals. Reasonable consumers, like Plaintiffs, would consider the inclusion of Heavy Metals or other toxins or contaminants a material fact when considering what baby food to purchase.

9.      Defendant's manufacture, distribution, and sale of the Baby Food Products were unlawful, unfair, false, and misleading, and the Defendant was unjustly enriched at the expense of Plaintiffs and members of the proposed Classes, as defined below.

## PARTIES

10.      Plaintiff Hannah Dempsey is a resident and citizen of the state of Connecticut. Between March 2021 and May 2021, Plaintiff Dempsey purchased baby food products manufactured by Defendant Gerber, including but not limited to Gerber Natural Banana, Gerber Natural Sweet Potato, Gerber Natural Apples, Gerber Natural Carrots, Probiotic Banana Oatmeal, Banana Cookies, and Banana Peach Teethers.  Plaintiff Dempsey purchased the products from a Walmart retail location located in Southington, Connecticut. If Plaintiff Dempsey had known that Defendant Gerber's baby food products were unsafe and unsuitable for babies and that testing showed that its products contained harmful Heavy Metals, Plaintiff Dempsey would not have purchased these products or would have paid less for them.

11.      Plaintiff Kathleen Hood is a resident and citizen of the state of Missouri.  Beginning in or around March 2021, Plaintiff Hood purchased baby food products manufactured by Defendant Gerber, including but not limited to Gerber Oatmeal, Gerber Natural Banana, and Gerber Natural Carrots.  Plaintiff Hood purchased the products from a Walmart retail store located in Joplin, Missouri. If Plaintiff Hood had known that Defendant Gerber's baby food products were unsafe and unsuitable for babies and that testing showed that its products contained harmful Heavy Metals, Plaintiff Hood would not have purchased these products or would have paid less for them.

12.     Defendant Gerber Products Company is incorporated in Michigan and maintains its principal place of business at 1812 North Moore Street, Arlington, VA 22209. Gerber sells baby food products under the brand name Gerber. Gerber organizes its products into broad categories of "formula", "baby cereal", "baby food", "snacks", "meals & sides", "beverages", and "organic". At all relevant times, Gerber has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of baby foods within this judicial District.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant maintains its corporate headquarters here.  In addition, Defendant regularly sells and markets its products in this District, and Defendant derives substantial revenue from sales of its products in this District, with the knowledge that its products are being marketed and sold for use in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant transacts substantial business in this District and Defendant is headquartered in Arlington, Virginia.

## PROCEDURAL HISTORY

16.     The instant action was originally filed on May 21, 2021 as part of a multi-defendant complaint against defendants Hain Celestial Group, Inc. ("Hain"), Gerber Products Company ("Gerber"), Beech-Nut Nutrition Company ("Beech-Nut"), and Plum, PBC ("Plum") in the Eastern District of New York, Case No. 2:21-cv-02887-JS-AYS.

17.     On June 7, 2021, the Judicial Panel on Multidistrict Litigation ("JPML") denied a motion for the centralization of related actions concerning the presence of heavy metals in baby foods against various defendants.

18.     After that decision was entered, counsel for Plaintiffs and Gerber discussed the prospect of severing the claims against Gerber and the corresponding transfer of those claims.

19.     To promote judicial economy and preserve resources – and to obviate the need for Gerber to file motions to sever and transfer – Plaintiffs Dempsey and Hood agreed to dismiss their Eastern District of New York complaint against Gerber and re-file their complaint against Gerber-only.

20.     In light of the competing motions to transfer the Gerber actions pending in the District of New Jersey and the Eastern District of Virginia and the uncertainty about where the cases would be transferred, Plaintiffs Dempsey and Hood did not immediately re-file their action. Rather, Plaintiffs Dempsey and Hood waited until there was a decision on the motions to transfer.

21.     On September 13, 2021, Chief Magistrate Judge Falk granted plaintiffs' motion to transfer in *In Re: Gerber Products Company Baby Food Litigation*, Lead Case No. 21-1977 (D.N.J.) and ordered that the cases pending in the District of New Jersey be transferred to the Eastern District of Virginia.  As a result, Plaintiffs Dempsey and Hood are filing the instant Complaint in this District.

## **FACTUAL ALLEGATIONS**

### A.    **The Presence of Heavy Metals in Baby Foods**

22.     Baby food manufacturers are free to set their own internal standards for toxic heavy metal content of their products. They have set those standards at dangerously high levels and have often sold foods that exceed even those levels.

23.    In October 2019, Healthy Babies Bright Futures ("HBBF"), an alliance of nonprofit organizations, published a report detailing the evaluation of baby food products for the presence of heavy metals.[5]  The HBBF Report found that 95% of the 168 baby foods products tested were contaminated with one or more toxic heavy metals, including arsenic, lead, cadmium, and/or mercury (the "Heavy Metals").[6]  All but 9 products contained at least one metal, and 26% of the baby foods tested contained *all four* of the Heavy Metals. [7]

24.    The researchers who published the HBBF Report explained the harms these metals can cause. They explained that arsenic, lead, mercury, and cadmium, four heavy metals found in the Baby Food Products, are neurotoxins. Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[8] The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[9] Even trace amounts of these heavy metals can alter the developing brain and erode a child's IQ. Arsenic causes potentially irreversible damage, including "cognitive deficits among school-age children exposed early in life, and neurological problems in adults who were exposed to arsenic-poisoned milk as infants."[10] According to the HBBF Report, research continues to confirm that exposure to

---

[5] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (last accessed May 10, 2021).
[6] *Id.* at 1.
[7] *Id.*
[8] *Id.* at 13.
[9] *Id.* at 6.
[10] *Id.* at 13

food containing arsenic, lead, mercury, and cadmium poses "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[11]

25.     The results of the HBBF Report were consistent with the FDA's 2017 investigation which found one or more Heavy Metal in 33 of 39 baby foods tested.[12]

26.     Despite the FDA's results, the FDA has failed to set enforceable limits or issue guidance on maximum safe amounts.[13]

**B.     A Congressional Report Also Found The Presence of Toxic Heavy Metals in Baby Food Products**

27.     As a result of the HBBF Report, on November 6, 2019, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform opened an investigation and requested documents and test results from seven of the largest baby food manufacturers in the United States.   The manufacturers included: (1) Gerber; (2) Nurture, Inc., which sells Happy Family Organics, including baby food products under the brand name HappyBABY; (3) Beech-Nut; (4) Hain Celestial Group, Inc., which sells baby food products under the brand name Earth's Best Organic; (5) Campbell Soup Company, which sells baby food products under the brand name Plum Organics; (6) Walmart Inc., which sells baby food products through its private brand Parent's Choice; and (7) Sprout Foods, Inc., which sells food under the name Sprout Organic Food.

28.     Nurture, Beech-Nut, Hain, and Gerber responded to the Subcommittee's requests.[14] They produced their internal testing policies, test results for ingredients and/or finished products,

---

[11] *Id.* at 1.
[12] *Id.* at 6.
[13] *Id.*
[14] Subcommittee Report at 2.

and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.[15]

29.    Sprout, Campbell (Plum Organics), and Walmart refused to cooperate with the government's investigation, to which the Congressional Subcommittee expressed "great concern[n] that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."[16]

30.    According to internal company documents and test results, and testing conducted by third-parties, the commercial baby foods manufactured by all seven companies were tainted with significant levels of Heavy Metals, including arsenic, lead, cadmium, and mercury.[17]

a.    **Arsenic**

31.    Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR").[18]   The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[19]

32.    Arsenic was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's

---

[15] *Id.*
[16] *Id.*
[17] Subcommittee Report at 2.
[18] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[19] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/).

testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

- Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

- Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

- Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.[20]

**b**.   **Lead**

33.     Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[21] Even at low levels, early childhood lead exposure has a negative impact on school performance and the cognitive effects of early childhood lead exposure appear to be permanent.[22] Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to FDA, lead is especially dangerous to "infants" and "young children."[23]

34.     Lead was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.

- Beech-Nut used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.

---

[20] Subcommittee Report at 3.
[21] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[22] Subcommittee Report at 11.
[23] *Id.*

- Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

- Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.[24]

### c.   Cadmium

35.     Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[25] Cadmium is associated with decreases in IQ, as well as the development of ADHD.[26]

36.     Cadmium was present in baby foods made by all responding companies.

- Beech-Nut used 105 ingredients that tested over 20 ppb cadmium. Some tested much higher, up to 344.55 ppb cadmium.

- Hain (Earth's Best Organic) used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium.

- Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.

- Seventy-five percent of Gerber's carrots contained cadmium in excess of 5 ppb, with some containing up to 87 ppb cadmium.[27]

### d.   Mercury

37.     Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[28]  Pre-natal mercury exposure has

---

[24] *Id.* at 3.
[25] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[26] Subcommittee Report at 12.
[27] *Id.* at 3-4
[28] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

been associated with adverse neurodevelopment and lower estimated IQ.[29]  Higher blood mercury levels in 2- and 3-year-olds were associated with autistic behaviors.[30]

     38.    Mercury was detected in baby food of the only responding company that tested for it.

- Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.

- Beech-Nut and Hain (Earth's Best Organic) do not even test for mercury in baby food.

- Gerber rarely tests for mercury in its baby foods.[31]

     39.    According to the Subcommittee Report, the levels at which these Heavy Metals are present in baby food products are "multiples higher than allowed under existing regulations for other products. For example, the FDA has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the Environmental Protection Agency has capped the allowable level of mercury in drinking water at 2 ppb. The test results of baby foods and their ingredients eclipse those levels: including results up to 91 times the arsenic level, up to 177 times the lead level, up to 69 times the cadmium level, and up to 5 times the mercury level."[32]

---

[29] Margaret R. Karagas et al., Evidence on the Human Health Effects of Low-Level Methylmercury Exposure (June 1, 2012) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1104494); Joseph Jacobson et al., Relation of Prenatal Methylmercury Exposure from Environmental Sources to Childhood IQ (Aug. 1, 2015) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1408554).
[30] Jia Ryu et al., Associations of Prenatal and Early Childhood Mercury Exposure with Autistic Behaviors at 5 Years of Age: The Mothers and Children's Environmental Health (MOCEH) Study (Dec. 15, 2017) (online at www.sciencedirect.com/science/article/pii/S0048969717316479).
[31] Subcommittee Report at 4.
[32] *Id.*

40.     As such, when baby food manufacturers are left to self-regulate and establish their own Heavy Metals standards, they routinely permit dangerously high levels of toxic heavy metals and often sell foods that exceeded even those levels.[33]

41.     In its conclusion, the Subcommittee stressed the danger associated with the presence of Heavy Metals in baby food: "[t]hese toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[34]

## C.     Documented Dangers of the Heavy Metals in Baby Foods

42.     Baby food producers promote their product testing and safety procedures because parents and caretakers pay attention to what ingredients are in the baby food they purchase for their children.

43.     The findings in the HBBF Report and the Subcommittee Report are alarming because the FDA and the WHO have declared the Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[35]  Babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity."[36] The fact that babies are small, have other developing organ systems, and absorb more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals.[37]

---

[33] *Id.* at 33.
[34] *Id.* at 59.
[35] *Id.* at 1.
[36] *Id.* at 9 (quoting Philippe Grandjean and Philip J. Landrigan, Neurobehavioural Effects of Developmental Toxicity (Mar. 13, 2014) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC4418502/)).
[37] *Id.* (citing Consumer Reports, Heavy Metals in Baby Food: What You Need to Know (Aug. 16, 2018) (online at www.consumerreports.org/food-safety/heavy-metals-in-baby-food/)).

44.     Research continuously shows that exposure to food containing Heavy Metals causes "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[38] Specifically, Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[39]  Exposure to the Heavy Metals may cause permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children.[40]  These developmental conditions can be caused by exposure to even trace amounts of these substances.[41]

**D.    Defendant's Marketing Falsely Claims That The Baby Food Products Are Safe And Omits All Material Information About The Presence Of Heavy Metals**

45.     Despite the disturbing findings that Defendant's products contain Heavy Metals which can cause significant harm to babies and children, Defendant continues to advertise and warrant that its Baby Food Products are healthy, safe, and suitable for consumption by babies.

46.     Defendant Gerber claims on its website that "[w]e have among the strictest standards in the world. From farm to highchair, we go through over 100 quality checks for every jar."[42] Defendant Gerber also claims that "our safety and quality standards are among the strictest in not just the U.S., but in the world" and "our farmers are using best in class practices to ensure quality ingredients and minimize the presence of any unwanted heavy metals.[43]  Gerber states, "Gerber baby foods are absolutely safe and healthy for baby and comply with all FDA requirements."[44] Additionally, all of Gerber product labels have the famous "Gerber Baby" logo,

---

[38] HBBF Report at 1.
[39] *Id.* at 6.
[40] Subcommittee Report at 9.
[41] HBBF Report at 1.
[42] https://www.gerber.com/commitment-to-quality.
[43] https://www.gerber.com/learning-center/quality-safety-faqs.
[44] *Id.*

as well as indications that the product is appropriate for crawling or sitting babies.  Gerber markets and advertises Gerber "Single Grain Rice Cereal," the very first solid food many babies consume, as containing ingredients that "support brain development" despite the presence of Heavy Metals.

47.   Gerber's packaging labels do not list, let alone warn, potential customers that its baby foods contain toxic heavy metals.

48.   As alleged herein, Defendant's marketing and advertising of the Baby Food Products are false, deceptive, and misleading to reasonable consumers because Defendant knows that Heavy Metals are harmful to babies yet it sold, and continues to sell, products containing harmful Heavy Metals as evidenced by its own testing as well as independent testing.

49.   Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding the Baby Food Products, namely, that they were unsafe and unsuitable for babies; that they contained Heavy Metals; the levels of the Heavy Metals; that its internal testing showed that its products contained Heavy Metals; and that its internal policies permitted the sale of baby food products with Heavy Metals. Defendant's distribution and sale of these products was unlawful, unfair, false, and misleading, and Defendant was unjustly enriched at the expense of Plaintiffs and Class members.

50.   Based on Defendant's decision to advertise and market the Baby Food Products as healthy and safe, Defendant had a duty to ensure that these statements were true and not misleading. As such, Defendant knew or should have known that the Baby Food Products included undisclosed and excessive levels of Heavy Metals, and that these toxins accumulate in the body over time.

51.   As a result of Defendant's misrepresentations and omissions, a reasonable consumer would have no reason to suspect the presence of Heavy Metals in the Baby Food

Products without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

## CLASS ACTION ALLEGATIONS

52.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Nationwide Class:

> All persons who purchased one or more of Gerber's Baby Food Products containing Heavy Metals, in the United States for personal/household use from the beginning of any applicable limitations period through the date of class certification. (the "Nationwide Class").

53.     Plaintiff Dempsey brings this action individually and on behalf of the following Connecticut subclass:

> All persons residing in Connecticut who purchased Gerber's Baby Food Products containing Heavy Metals for personal/household use from the beginning of any applicable limitations period through the date of class certification (the "Connecticut Subclass").

54.     Plaintiff Hood brings this action individually and on behalf of the following Missouri subclass:

> All persons residing in Missouri who purchased Gerber's Baby Food Products containing Heavy Metals for personal/household use from the beginning of any applicable limitations period through the date of class certification (the "Missouri Subclass").

55.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

56.     Numerosity (Rule 23(a)(1)): The exact number of members of the Class is unknown and currently unavailable to Plaintiffs, but joinder of individual members herein is impractical.

The Class is likely comprised of thousands of consumers. The precise number of Class members, and their addresses, is unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

57.     Predominant Common Questions (Rule 23(a)(2)): The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. The common and legal questions include, without limitation:

a.   Whether the Defendant knew or should have known that its Baby Food Products contained Heavy Metals that rendered its Baby Food Products unsafe for babies;

b.   Whether Defendant misleadingly represented and continue to represent that its Baby Food Products are safe for babies' consumption;

c.   Whether Defendant's representations, advertisements, warranties, labeling, packaging, and logos are false, deceptive, and/or misleading;

d.   Whether Defendant had knowledge that those representations were likely to deceive a reasonable consumer;

e.   Whether Defendant had knowledge that those representations were false, deceptive, and/or misleading;

f.   Whether Defendant continues to disseminate those false, misleading, and/or deceptive representations;

g.   Whether Defendant failed to warn and disclose material facts regarding the Baby Food Products and concealed internal testing results revealing dangerous levels of Heavy Metals that are unsafe for babies;

h. Whether Defendant's testing showed that its products contained Heavy Metals;

i. Whether Defendant violated the state consumer protection statutes alleged herein;

j. Whether Defendant made negligent misrepresentations and/or omissions;

k. Whether Defendant breached its express warranties;

l. Whether Defendant breached its implied warranties;

m. Whether Defendant was unjustly enriched; and

n. The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

58. Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased Defendant's Baby Food Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class Members.

59. Adequacy of Representation (Rule 23(a)(4)): Plaintiffs adequately represent the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

60. Superiority (Rule 23(b)(3)): A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay

and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

61.     Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)): In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or  Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

### BREACH OF EXPRESS WARRANTY
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively, the Subclasses) against Defendant)**

62.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

63.     Defendant marketed and sold the Baby Food Products into the stream of commerce with the intent that the Baby Food Products would be purchased by Plaintiffs and the Nationwide Class.

64.     Defendant utilized false and deceptive product labels as well as advertising to promote, encourage, and urge the use, purchase, and utilization of the Baby Food Products by

representing the quality and safety to parents and purchasers, Plaintiffs, and the public in such a way as to induce their purchase or use.

65.     For example, Defendant expressly warranted that its foods were safe for consumption by babies in a misleading manner, calling them, *inter alia*, "safe" and "healthy" and that it has "among the strictest standards in the world."

66.     Through these representations, Defendant made express warranties that these foods would conform to the representations. More specifically, Defendant represented that these foods, when ingested by babies and children in the manner foreseen by Defendant, were safe and effective, that these foods were healthy and safe for consumption by babies.

67.     Defendant represented that the Baby Food Products only contained the ingredients disclosed on the label. These specific misrepresentations went beyond mere puffery as they were printed on the very product and in the product labeling.

68.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

69.     The Baby Food Products ingested by Plaintiffs' children did not conform to the representations made by Defendant, because these foods contained toxic levels of Heavy Metals and ingredients not safe for human ingestion in the manner intended by Defendant and contained ingredients not disclosed in the product labeling.

70.     Plaintiffs, by use of reasonable care, could not have discovered the breached warranty and realized the hidden increased risks and unreasonable dangers of allowing their children to ingest these foods.  Plaintiffs did not know of the presence of these toxins until after the release of the Subcommittee Report on February 4, 2021.

71.     As a direct or proximate result of Defendant's conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of the Baby Food Products that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of Heavy Metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial. Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendant's actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of its actions. By Defendant putting its own pecuniary interests ahead of all else, it sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food safe for consumption by babies and children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendant.

## COUNT II

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On behalf of Plaintiffs and the Nationwide class (or alternatively, the Subclasses) against Defendant)**

72.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

73.     At all relevant times, Defendant was a merchant who dealt in goods of that kind, and in fact, boasted about its processes in production of safe and healthy baby food.

74.     The baby foods at issue were unreasonably dangerous for either the use to which they would ordinarily by put or for some other reasonably foreseeable purpose, and the unreasonably dangerous condition existed when the goods left the Defendant's hands. The baby

foods at issue would not pass without objection in the trade and are not reasonably fit for the ordinary purposes for which such goods are used.

75.     Unbeknownst to them, at the time the Plaintiffs purchased these baby foods, they contained toxic levels of Heavy Metals.

76.      Plaintiffs did not know of the presence of the Heavy Metals until after the release of the Subcommittee Report on February 4, 2021.

77.     The products at issue, even if they served their purpose in serving as food and sustenance for babies and children, cannot create a benefit of the bargain because the Heavy Metals, and their dangerous effects were never bargained for.

78.     Because of the presence of these Heavy Metals, these products do create a present economic injury to Plaintiffs and the putative class because their sale should never have occurred.

79.     As a direct or proximate result of Defendant's conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of Heavy Metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

80.     Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendant's actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of its actions. By Defendant putting its own pecuniary interests ahead of all else, it sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their babies and children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendant.

**COUNT III**

**NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively, the Subclasses) against**
**Defendant)**

81.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

82.     Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, manufacturing, marketing, distribution, and sale of its Baby Food Products.

83.     Defendant breached its duty to Plaintiffs and the Class by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and the Class that do not have the ingredients, qualities, characteristics, and suitability for consumption as advertised by Defendant and by failing to promptly remove the products containing Heavy Metals from the marketplace or to take other appropriate remedial action.

84.     Defendant knew or should have known that the ingredients, qualities, and characteristics of the Baby Food Products were not as advertised or suitable for their intended use (consumption by babies) and were otherwise not as warranted and represented by Defendant.

85.     Specifically, Defendant knew or should have known that: (1) its Baby Food Products at issue were not healthy, or safe for consumption because they contained or had a risk of containing levels of Heavy Metals; (2) the Baby Food Products were adulterated or at risk of being adulterated by Heavy Metals; and (3) the Baby Food Products were otherwise not as warranted and represented by Defendant.

86.     Plaintiffs and the Class justifiably and reasonably relied on Defendant's representations as to the ingredients, qualities, and characteristics of the Baby Food Products.

22

87.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they have purchased Baby Food Products that were worth less than the price they paid and that they would not have purchased at all, had they known of the presence or risk of Heavy Metals that do not conform to the products' labels, packaging, advertising, and statements.

88.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT IV

### UNJUST ENRICHMENT
**(On behalf of the Plaintiffs and the Nationwide Class (or alternatively, the Subclasses) against Defendant)**

89.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

90.     Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's products containing Heavy Metals that were unsafe and not suitable for babies.

91.     Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Baby Food Products contain harmful Heavy Metals that render Defendant's products unsafe and unsuitable for consumption by babies. If Plaintiffs and Class members had known the true nature of Defendant's products, they would not have paid money for them or would have paid less. Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

## COUNT V

### VIOLATIONS OF CONNECTICUT TRADE PRACTICES ACT
### Conn. Gen. Stat. §§ 42-110g, *et seq*.
### (On behalf of the Connecticut Subclass Against Defendant Gerber)

92.     Plaintiff Dempsey hereby incorporates all other paragraphs of this Complaint and restate them as if fully set forth herein.

93.     Defendant Gerber is a "person" as defined by Conn. Gen. Stat. § 42-110a(3).

94.     Defendant is engaged in "trade" or "commerce" as those terms are defined by Conn. Gen. Stat. § 42-110a(4).

95.     Defendant Gerber advertised, offered, or sold goods or services in Connecticut, engaged in trade or commerce directly or indirectly affecting the people of Connecticut.

96.     Defendant Gerber engaged in deceptive acts and practices and unfair acts and practices in the conduct of trade or commerce, in violation of the Conn. Gen. Stat. § 42-110b, by making misrepresentations and false statements concerning the Baby Food Products.

97.     Defendant Gerber's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

98.     As a direct and proximate result of Defendant Gerber's deceptive acts and practices, Plaintiff Dempsey and the Connecticut Subclass members suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, inclusive of not receiving the benefit of their bargain in purchasing the affected products.

99.     Defendant Gerber's deceptive acts and practices caused substantial, ascertainable injury to Plaintiff Dempsey and the Connecticut Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

100.    Defendant Gerber's violations of Connecticut law were done with reckless

indifference to Plaintiff Dempsey and the Connecticut Subclass members, or was with an intentional or wanton violation of those rights.

101.    Plaintiff Dempsey requests damages in the amount to be determined at trial, including statutory and common law damages, attorneys' fees, and punitive damages.

## COUNT VI

**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. §§ 407 et seq.**
**(on Behalf of the Missouri Subclass against Defendant Gerber)**

102.    Plaintiff Hood hereby incorporates all other paragraphs of this Complaint and restate them as if fully set forth herein.

103.    Plaintiff Hood and the Missouri Subclass members are residents of the State of Missouri.

104.    At all times mentioned herein, Defendant Gerber engaged in "trade" or "commerce" in Missouri, as defined by Mo. Rev. Stat. § 407.010(7), in that it advertised, offered for sale, and sold provided goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services", "property", "article[s]", "commodit[ies]" or "thing[s] of value" in Missouri.

105.    Plaintiff Hood and the Missouri Subclass members purchased Gerber Baby Food Products "primarily for personal, family or household purposes." Mo. Rev. Stat. § 407.025(1).

106.    The Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020 provides that "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in the state of Missouri, is declared to be an unlawful practice."

107.   For the reasons discussed herein, Defendant Gerber violated and continues to violate the MMPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Mo. Rev. Stat. § 407.020 et seq. Defendant Gerber's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

108.   Defendant Gerber repeatedly advertised, both on the labels for Gerber Baby Food Products and through advertising, that Gerber Baby Food Products were and are safe, healthy, and suitable for consumption by babies. Defendant Gerber failed to disclose the material information that its Baby Food Products contained unsafe levels of Heavy Metals.

109.   Defendant Gerber's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase Gerber Baby Food Products without being aware that the products contained unsafe levels of toxic Heavy Metals. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Hood and the Missouri Subclass members suffered damages by purchasing Gerber Baby Food Products because they would not have purchased Gerber Baby Food Products had they known the truth.

110.   Defendant Gerber's deceptive trade practices caused injury in fact and actual damages to Plaintiff Hood and the Missouri Subclass members in the form of the loss or diminishment of value of Gerber Baby Food Products Plaintiff Hood and the Missouri Subclass members purchased, which allowed Defendant Gerber to profit at the expense of Plaintiff Hood and the Missouri Subclass members. The injuries Plaintiff Hood and the Missouri Subclass members were to legally protected interests. The gravity of the harm of Defendant Gerber's actions is significant and there is no corresponding benefit to consumers of such conduct.

111.    Plaintiff Hood and the Missouri Subclass members seek relief for the injuries they have suffered as a result of Defendant Gerber's unfair and deceptive acts and practices, as provided by Mo. Rev. Stat. § 407.025 and applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

a.    Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b.    Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c.    Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d.    For declaratory and equitable relief, including restitution and disgorgement;

e.    For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.    Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g.    Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

h.    Awarding pre-judgment and post-judgment interest;

i.    For punitive damages; and

j.    Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: September 23, 2021

**PHELAN PETTY, PLC**

By:_____/s/_____

Michael G. Phelan (VSB No. 29725)
Jonathan M. Petty (VSB No. 43100)
Christopher P. Yakubisin (VSB No. 91186)
Brielle M. Hunt (VSB No. 87652)
3315 West Broad Street
Richmond, VA 23230
Telephone: 804-980-7100
Facsimile: 804-767-4601
Email: mphelan@phelanpetty.com
        Jpetty@phelanpetty.com
        cyakubisin@phelanpetty.com
        bhunt@phelanpetty.com


**LEVI & KORSINSKY, LLP**

Mark S. Reich (*pro hac vice* to be filed)
Courtney E. Maccarone (*pro hac vice* to be filed)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
        cmaccarone@zlk.com


*Counsel for Plaintiffs*